**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA

v.                             4:07-CR-00311-WRW

OMAR RIVERA

**AMENDED ORDER**[1]

Pending is Defendant's Motion to Suppress Physical Evidence (Doc. No. 21). The has Prosecution responded (Doc. No. 25). After a hearing on April 24, 2008, Defendant submitted a supplemental brief (Doc. No. 32), as did the Prosecution (Doc. No. 35). For the reasons set out below, Defendant's Motion to Suppress (Doc. No. 21) is GRANTED.

**I. BACKGROUND**

On the morning of September 2, 2007, Defendant was traveling east on Interstate 40, near Lonoke, Arkansas.[2] Defendant, a resident of Texas, was driving his truck, which had a Texas license plate tag.[3] Arkansas State Police Trooper Victor Coleman[4] was working on Interstate 40, near the 180-mile marker, when he saw Defendant following too close to another vehicle.[5]

---

[1]Citation in former footnote 78, current footnote 79, corrected.

[2]Doc. No. 21.

[3]*Id*.

[4]Trooper Coleman has been employed by the Arkansas State Police for 21 years. At the time of the hearing, he was assigned to the criminal patrol unit of the highway patrol. He has a canine partner, Scarlet, and they are certified as a team. Since her initial certification, Scarlet has been certified annually. Trooper Coleman testified that, when Scarlet alerts, her breathing becomes heavier and she scratches at the location.

[5]Doc. No. 35.

1

Mr. Coleman also testified[6] that Defendant was driving faster than the posted speed limit, so he turned on his blue lights, and, at about 10:23 a.m., stopped Defendant for traffic violations.

The stop was captured on tape, both audio and video.[7] After making the stop, Mr. Coleman approached the passenger door of Defendant's truck and asked for his driver's license. He told the Defendant that he should leave more space between himself and the car in front of him.[8] Then he continued by asking Defendant about his destination -- to which Defendant responded "Memphis, Tennessee."[9] Next he asked Defendant if he was going there to work or visit, and Defendant said that he was going to Memphis to pick up his family.[10] Then Mr. Coleman asked to see Defendant's registration. He asked what Defendant's family was doing in Memphis. Defendant replied "Picking up my family."[11] Mr. Coleman replied "No, why are they in Memphis though?"[12] Defendant answered "What?"[13]

After about one minute and twenty seconds, Mr. Coleman asked Defendant to step out of his truck. Defendant walked to the back of his truck, where Mr. Coleman continued to question him.[14] Officer Coleman inquired as to the whereabouts of Defendant's family in Memphis.

---

[6] April 24, 2008, Suppression Hearing.

[7] A transcript of the stop is attached to the Prosecution's Supplemental Motion in Response to Defendant's Motion to Suppress Evidence. Doc. No. 35.

[8] Doc. No. 35.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] Doc. No. 35.

Defendant responded "He, he, he, you know my, my wife, he went on a trip, ah, you know my mother in law."[15] Mr. Coleman asked how Defendant's wife got to Memphis. Defendant replied "Huh?"[16] Mr. Coleman repeated his question, and Defendant asked "How?"[17] Trooper Coleman responded "Ah, huh."[18] Defendant asked "What do you mean how?"[19]

Eventually Defendant explained that his wife had traveled to Memphis on a bus. Mr. Coleman asked Defendant if he had ever been arrested before; Defendant told him "Yeah, no,"[20] and showed Mr. Coleman, upon his request, another ticket he had gotten earlier that morning. The Trooper then asked Defendant where his mother-in-law lived in Memphis. Defendant replied "I really, really, I don't know."[21] Officer Coleman asked Defendant how he would find his mother-in-law. Defendant answered "Huh? . . . I send her to -- I, I sent my wife and my, and my ah, you know my ah, and ah, you know the . . ."[22] Mr. Coleman asked how Defendant was going to find his wife when he got to Memphis. Defendant explained "I need to call her for" and then added "yeah my brother in law."[23]

---

[15]*Id.*

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]*Id.*

[20]Doc. No. 35.

[21]*Id.*

[22]*Id.*

[23]*Id.*

Around this time Trooper Coleman asked Defendant if he could search Defendant's truck. Defendant said "yeah."[24] Mr. Coleman asked again if Defendant minded if he searched Defendant's vehicle. Defendant said "You can look in."[25] Mr. Coleman then asked Defendant to have a seat in the patrol car.[26]

While in the patrol car, Mr. Coleman ran a check on Defendant's driver's license and vehicle. Officer Coleman also continued asking Defendant how he was going to find his wife in Memphis.[27] Mr. Coleman asked if Defendant was going to call his wife. Defendant responded that his wife was going to call him. Defendant said "I am gonna go the to Memphis and ah, ah, ah my wife, my, my wife he, he call me. Uh, maybe he call me right now."[28] After asking Defendant if the truck he was driving was his, when he bought it, and what time he left Dallas this morning, Trooper Coleman asked "And when you get to Memphis, he supposed to just call you or whatever. You don't know how to get a hold of him?"[29] In broken English, Defendant explained that he needed to stop at the McDonald's on Kirby.[30]

Mr. Coleman asked Defendant if he would sign a consent form, and offered the form in either English or Spanish.[31] Defendant said Spanish was better and "I speak English little bit."[32]

---

[24]*Id.*

[25]*Id.*

[26]Doc. No. 35.

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]Doc. No. 35.

4

Mr. Coleman gave Defendant the consent form in Spanish, and continued questioning Defendant. About 15 minutes after Defendant was stopped, Defendant asked "What you say, if me say no?"[33] Trooper Coleman informed Defendant that he would just run the dog around the truck, and asked "You don't want me to search it?"[34] Defendant replied "No."[35] The back-up Mr. Coleman requested had arrived by that time, and Defendant was moved to the other patrol car.

Almost immediately after Defendant refused the search, Mr. Coleman ran his dog around the truck. Mr. Coleman testified[36] that the dog alerted in the front of the vehicle; the front of the vehicle is not visible in the video. Mr. Coleman and the other Officer then began searching Defendant's truck.[37] The Troopers found nothing after searching the truck for approximately an hour and a half while it was parked on the side of the road.[38] Defendant and the truck were then taken to a wrecker company where the Troopers continued the search. Eventually cocaine was found under the windshield.[39] Defendant was arrested for possession of cocaine with the intent to deliver.[40]

---

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]April 24, 2008, Suppression Hearing.

[37]After approximately another 20 minutes, the hood of the patrol car taping the stop was opened, and remained open for the remaining one and a half hours caught on film; because the hood was open, neither the truck nor the Troopers were visible.

[38]Doc. No. 21.

[39]*Id.*

[40]*Id.*

Defendant filed a Motion to Suppress the cocaine found in the search, asserting that Trooper Coleman had no reasonable suspicion to detain him after the initial traffic stop.[41] The Prosecution maintains that Mr. Coleman had reasonable suspicion to expand the scope of the stop based on the totality of the circumstances and his experience. The Prosecution contends the following factors create a reasonable suspicion: (1) Defendant had two cell phones in the truck with him; (2) Defendant's answers about the purpose of his trip were conflicting (Defendant was going to meet his wife, but did not know where she was staying -- Defendant was going to call his brother in law, but did not have his telephone number -- Defendant's brother in law was going to call him, and all Mr. Rivera knew was that he needed to meet at a McDonald's); (3) Defendant seemed nervous; and (4) the fact that Defendant was going from Dallas to Memphis was also an indicator.[42] In the alternative, the Prosecution asserts that the 17 minutes between the time when Defendant was pulled over until when the dog alerted was *de minimis*.

## II. DISCUSSION

Even a minor traffic violation creates probable cause to stop a vehicle.[43] Defendant does not dispute the legality of the initial stop for following too close, but claims that the Officer had no reasonable suspicion to hold him after the initial stop was complete.

During a traffic stop, a Trooper may detain the vehicle's occupants to see a driver's license and vehicle registration; the Trooper may also ask about the purpose and route of the trip.[44] "'An investigative detention must . . . last no longer than is necessary to effectuate the

---

[41] *Id.*

[42] Doc. No. 35.

[43] *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007).

[44] *United States v. Peralez*, No. 07-1649, 2008 U.S. App. Lexis 10358, at *9 (8th Cir. May 14, 2008).

purpose of the stop'"[45] and the "'methods employed should . . . verify or dispel the Trooper's suspicions in a short period of time.'"[46] "A constitutionally permitted traffic stop can become unlawful . . . 'if it is prolonged beyond the time reasonably required to complete' its purpose."[47] Yet, if a detainee provides conflicting answers to questions reasonably related to the investigative detention, an Trooper may develop a reasonable suspicion that "criminal activity may be afoot" -- that reasonable suspicion would allow the Trooper to ask more intrusive questions and expand the scope of his investigation.[48] Reasonable suspicion is determined by "the totality of the circumstances, in light of the Trooper's experience."[49] There is no "bright line test to determine when police conduct exceeds the bounds of an investigative stop."[50]

**A**. **Factors Given in Support of Reasonable Suspicion**

1. <u>Defendant Appeared Nervous</u>

Trooper Coleman and the Prosecution assert that Defendant appeared nervous, and rely on that assertion in support of reasonable suspicion. I watched the video from the time of the stop until the time the hood on Mr. Coleman's patrol unit was opened (about 36 minutes). It appears to me that Defendant spoke calmly with Mr. Coleman, and answered his questions in as much depth as, apparently, Defendant's knowledge of the English language would allow. From

---

[45]*United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994).

[46]*United States v. Willis*, 967 F.2d 1220, 1224 (8th Cir. 1992) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[47]*Peralez*, 2008 U.S. App. Lexis 10358, at *8 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

[48]*Terry v. Ohio*, 392 U.S. 1, 30 (1968).

[49]*United States v. Dodson*, 109 F.3d 486, 488 (8th Cir. 1997).

[50]*Willis*, 967 F.2d at 1224.

what I could see, Defendant did not exhibit any of the typical, physical signs of being nervous -- fidgeting or looking around, for example. Defendant complied with Mr. Coleman's requests and was neither impolite nor argumentative. While the opinion of an experienced officer (as Mr. Coleman is) on-the-scene should be given careful attention, I simply cannot agree that Defendant appeared nervous. As noted, he appeared calm to me.

### 2. Two Cell Phones

Mr. Coleman found two mobile phones in Defendant's truck. Carrying two mobile phones is consistent with innocent travel. For example, many employers provide mobile phones to employees, perhaps in addition to the employee's personal cell phone. The practice is so common that Congress realized the need to modernize the current tax code in connection with employer-provided mobile phones.[51] In determining reasonable suspicion, the "relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."[52] The degree of suspicion in connection with carrying two cell phones is low or non-existent. Trooper Coleman, however, testified[53] at the

---

[51]Modernize Our Bookkeeping In The Law For Employee's Cell Phone Act of 2008, S. 2668 and H.R. 5450. The Bill was introduced on February 26, 2008, and, if passed, would delete mobile phones from items treated as "listed property" under the Internal Revenue Code, which would end cumbersome record-keeping requirements and the employment tax consequences of making personal calls on mobile phones provided by employers. Senator John Kerry (D-MA) said of the initiative:

> We need to modernize the law now to reflect the reality that the use of cell phones by businesses has changed dramatically in the last ten years. In the last twenty years, the use of communication devices has skyrocketed, making them cheaper, faster, and more accessible than ever. Cell phones are no longer executive perks or luxury items, and an antiquated tax code shouldn't treat them that way any more.

Http://www.mondaq.com/article.asp?articleid=60168&login=true. Last visited May 23, 2008.

[52]*United States v. Crawford*, 891 F.2d 680, 681 (8th Cir. 1989) (quoting *United States v. Sokolow*, 490 U.S. 1, 10 (1989)).

[53]April 24, 2008, Suppression Hearing.

suppression hearing that individuals transporting narcotics often carry multiple cell phones. Denial of a suppression motion has been upheld -- *i.e.* reasonable suspicion confirmed -- when, among other factors, there were three mobile phones in a car with only the driver and one passenger.[54]

### 3. Defendant's Explanation of His Trip

The Prosecution asserts that Defendant's explanation of his trip was not plausible. It is true that Defendant's answers were confusing and often non-responsive, but it is clear from the beginning of the taped conversation that his understanding (and speaking) of English was poor. These answers were as consistent with a failure to understand, as with an evasive design. Mr. Coleman recognized that language was an issue and offered Defendant the consent form in Spanish. At one point during the suppression hearing, Mr. Coleman testified[55] that he did not think a language barrier separated him and Defendant, but at another point he testified[56] that he wanted Defendant to sign a written consent form because of the language problem. The transcript of the stop clearly reveals that language was a barrier. Taking the communication problem into account, Defendant's answers were sometimes incomprehensible -- but I do not believe that they were "evasive" -- Defendant's limited knowledge of English is at least as plausible an explanation as is "evasion."

The Prosecution asserts:

Rivera's answers about the purpose of his trip also raised [Trooper Coleman's] suspicion. Trooper Coleman believed that the answers were conflicting. Rivera was to meet his wife but did not have an address of where she was staying. Then, he was going to call his brother-in-law but did not have his number. Then, Rivera's brother-

---

[54]See *United States v. Arana-Durante*, 244 Fed. Appx. 121, 122 (9th Cir. 2007).

[55]April 24, 2008, Suppression Hearing.

[56]*Id.*

9

in-law was supposed to call him and all Rivera knew was that he needed to meet at a McDonald's.[57]

In the transcript of the stop, Defendant answered "Yeah" when Trooper Coleman asked him if Defendant knew his wife's cell phone number. From the transcript, it is unclear who was to call Defendant -- his wife or brother-in-law -- because Defendant does not use the pronouns "he" and "she" properly.[58] Even very early during the stop, Defendant referred to his wife as "he."[59] Defendant never said he was going to meet anyone at McDonald's; he said that he needed to stop at the McDonald's.

### 4. Driving From Dallas to Memphis

In connection with Defendant driving from Dallas to Memphis, the Eighth Circuit has "held that out-of-state plates are consistent with innocent behavior and not probative of reasonable suspicion."[60] At the hearing, Trooper Coleman testified[61] that Dallas, Texas, was a narcotics "source area."[62] I have been taught that an alleged "source" area is not a factor to be considered in finding a "reasonable suspicion."[63]

---

[57]Doc. No. 35.

[58]*Id*.

[59]*Id*.

[60]*United States v. Beck*, 140 F.3d 1129, 1137-38 (8th Cir. 1998) (citing *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994). See also *Karnes v. Skrutski*, 62 F.3d 485, 495 (8th Cir.1995) (Sole fact that driver of car from Florida, a "drug center" and car registered in Florida would not be a factor supporting reasonable suspicion.).

[61]April 24, 2008, Suppression Hearing.

[62]*Id*.

[63]See *Beck*, 140 F.3d at 1137-38; *Reid v. Georgia*, 448 U.S. 438, 440-41 (1980) (no reasonable suspicion based on fitting a "drug courier profile").

**B. Reasonable Suspicion**

Defendant relies on *United States v. Beck*[64] to support his motion to suppress.[65] In that case, the prosecution identified the following factors as supporting reasonable suspicion:

> 1) Beck was driving a rental car which had been rented by an absent third party; (2) the [car] was licensed in California; (3) there was fast food trash on the passenger side floorboard; (4) no visible luggage in the passenger compartment of the automobile; (5) Beck's nervous demeanor; (6) Beck's trip from a drug source state to a drug demand state; and (7) Trooper Taylor's disbelief of Beck's explanation for the trip.[66]

In *Beck*, the Trooper told Beck he was free to go, and then began questioning Beck anew. The Eighth Circuit Court of Appeals found that Beck was detained without reasonable suspicion after the time the Trooper told him he was free to go, and that evidence found during the unlawful detention should have been suppressed; the district court's denial of Beck's motion to suppress was reversed, and the case remanded for further proceedings.[67]

Mr. Coleman questioned Defendant for approximately six minutes before requesting the check on Defendant's license and registration. Trooper Coleman continued questioning Defendant for another ten minutes until Defendant refused to sign the consent form. Scarlet was in Mr. Coleman's car the entire time of the stop. Running a dog around the exterior of a vehicle is not a search,[68] and Mr. Coleman could have taken Scarlet around Defendant's truck earlier if

---

[64]140 F.3d 1129 (8th Cir. 1998) .

[65]Doc. No. 21.

[66]*Id*. at 1137.

[67]*Id*. at 1140.

[68]*Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (A dog sniff conducted during traffic stop "lawful at its inception and otherwise executed in a reasonable manner" is not subject to Fourth Amendment.).

he had suspicions. It appears that Trooper Coleman's suspicions arose or gelled only after Defendant refused to sign the consent form.

The factors given by the Prosecution in support of reasonable suspicion do not quite cross the finish line. Defendant did not appear nervous; Defendant's story is plausible, or at least consistent with not understanding the questions; carrying two mobile phones is consistent with innocent behavior; and a truck with Texas tags driving to Memphis is not probative of reasonable suspicion. Considering the factors together, in the totality of the circumstances, I cannot agree that reasonable suspicion existed for Defendant to be detained beyond the point that Mr. Coleman ran a check on Defendant's license and vehicle registration. That is the point when the initial traffic stop should have ended.  Defendant's detention beyond that point in time was unlawful.

**C. De Minimis**

The Prosecution argues that even if Defendant was detained illegally after the initial stop ended, the additional detention was *de minimis*.[69] I disagree. In its brief, the Prosecution wrote:

> However, even if the Court finds that the traffic stop had ended and that there was no reasonable suspicion, the brief time that it took to run the dog was so quick as to be *de minimis*. At most, it was only minutes. At approximately 10:38 was when the defendant decided not to sign the written consent form. By approximately 10:40, the dog had alerted.[70]

The problem with this argument is that Defendant's detention started before 10:38, was unlawful, and, without the unlawful detention, Mr. Coleman would not have seized the evidence.

---

[69]See *United States v. Alexander*, 448 F.3d 1014, 1017 (8th Cir. 2006).

[70]Doc. No. 35.

"A dog sniff may be the product of an unconstitutional seizure . . . if the traffic stop is unreasonably prolonged before the dog is employed."[71] "To establish an unreasonably prolonged detention, [a defendant] must show that he was detained beyond the time justified by the traffic stop, and that the detention was not supported by reasonable suspicion."[72] The suppression of evidence may be justified when, but-for the constitutional violation, the evidence would not have been seized.[73]

I explained above why Defendant's detention was not supported by reasonable suspicion, so I will not repeat that here. Mr. Coleman detained Defendant longer than was justified by the traffic stop. During a traffic stop, an officer may ask the driver for his license and registration, as well as about the destination, route, and purpose of the trip.[74] According to the digital clock on the video of the stop, Defendant was pulled over at about 10:23:54 a.m. Within a little over half a minute, Trooper Coleman began expanding the scope of his questions to why Defendant's family is in Memphis (10:24:30); what kind of work Defendant does (10:24:40); how his wife got to Memphis (10:25:22); and if Defendant had been arrested before (10:26:04). It seems to me that Mr. Coleman, who is involved in criminal interdiction, used a "blended process"[75] of asking Defendant interdiction questions while asking routine traffic-stop questions. This lengthened the time of Defendant's detention.

---

[71]*United States v. Martin,* 411 F.3d 998, 1003 (8th Cir. 2005) (citing *Illinois v. Cabelles*, 543 U.S. 405 (2005)).

[72]*Martin*, 411 F.3d at 1003.

[73]*Hudson v. Michigan*, 547 U.S. 586, 593 (2006).

[74]See *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005).

[75]*Peralez*, 2008 U.S. App. Lexis 10358, at *10.

Despite having Scarlet in the car throughout the stop, Mr. Coleman never indicated that he wanted to run the dog around until Defendant decided not to sign the consent form. According to the transcript of the stop, Defendant asked what would happen if he did not sign the consent form.[76] Mr. Coleman answered "Yeah, I'll just run the dog around it or whatever if you say no."[77] Then, Defendant indicated that he would not sign the consent form, and Trooper Coleman immediately started to bring out the dog.[78] This was approximately at approximately 10:38:52, about 15 minutes into the stop, well after the Officer had run a check on Defendant's license and registration. But-for Defendant's unjustifiably prolonged detention, which was not supported by reasonable suspicion, Mr. Coleman would not have decided to run Scarlet around Defendant's truck, and the evidence would not have been seized. Accordingly, the additional detention was not *de minimis*.

## III. CONCLUSION

The facts of this case put me in mind of a passage I read from one of United States District Judge George Kazen's Orders while I was holding court in Laredo several years ago:

> The lines drawn in this area are necessarily fine ones. As the Court has frequently observed, an argument can be made that every vehicle traveling on South Texas highways is suspicious. Over the course of time, this Court has heard testimony that law enforcement officers are suspicious of old cars, new cars, small cars, large cars, pickup trucks, sedans, station wagons, and vans. They are suspicious of vehicular travel late at night or early in the morning. They are suspicious of vehicular travel at various shift-change hours. They are suspicious of driver who avoid eye contact and also of drivers who are overly friendly. In the instant case they were suspicious when the Defendant turned south back to Laredo but undoubtedly would have been equally suspicious had he turned north toward San Antonio. This observation is not a criticism of the agents. They have a difficult, if not overpowering task, and the movement of contraband is pervasive. Unless and until virtually all South Texas

---

[76]Doc. No. 35.

[77]*Id*.

[78]*Id*.

traffic is deemed suspicious, this Court must balance the factors in each case, looking for those special articulable facts that can justify a stop under the United States Constitution.[79]

Defendant was detained unlawfully after the initial traffic stop, and but-for that detention, the evidence would not have been seized. Any evidence gathered after the initial stop should be suppressed.  Accordingly, Defendant's Motion to Suppress is GRANTED.

IT IS SO ORDERED this 11th day of June, 2008.

/s/ Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[79]*United States v. Ramos*, Case No. L-90-188  (S.D. Tx. 1990).